IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOHN MCPARTLIN,                          §
                                         §
            Plaintiff,                   §
                                         §
v.                                       §            Civil Action No. 3:15-CV-03042-N
                                         §
RHONDA HUNTER, *et al.*,                 §
                                         §
            Defendants.                  §

## ORDER

This Order addresses Defendants Joseph Capps, Azucena Duckworth, and Ronda Hunter's[1] (collectively, the "Official Defendants") motion to dismiss [11]. The Court denies the motion.

## I. TREATMENT FOR EYE CANCER IN PRISON

This case arises from the medical treatment that Plaintiff John McPartlin received during his incarceration at Federal Correction Institute Seagoville ("FCI Seagoville") and at the Sheridan Detention Center. McPartlin brings claims under *Bivens*[2] for violation of his Eighth Amendment rights. The Official Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. The Official Defendants also asserted the affirmative defense of failure to exhaust

---

[1]The Official Defendants advise the Court that the correct spelling of Hunter's first name is "Ronda," not "Rhonda." *See* Defs.' Br. in Supp. 1 n.1 [12-1].

[2]*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

ORDER – PAGE 1

administrative remedies, and Duckworth and Hunter claimed qualified immunity. On May 2, 2016, the Court converted the motion to one for summary judgment under Rule 56. *See* Order 1, May 2, 2016 [21]. The following recitation of the facts draws upon the Appendix to Defendants' Brief in Support of Their Motion to Dismiss [12] (hereafter "Defs.' App."), and Plaintiff's Appendix to Response to Defendants' Motion for Summary Judgment [23] (hereafter "Pl.'s App.").

### A. McPartlin's Optometrist Refers Him for Oncological Treatment

McPartlin began experiencing problems with the vision in his right eye in February 2010. Pl.'s App. 1. Although McPartlin asked to see a contract optometrist, medical personnel at FCI Seagoville removed him from the waiting list on January 31, 2012. *Id.* at 2. Capps, a contract physician for FCI Seagoville, *see* Defs.' Br. in Supp. 2, approved the removal without explanation. *See* Pl.'s App. 2. McPartlin submitted three requests to staff – including one to Hunter, the Health Services Administrator at FCI Seagoville – regarding his status on the waitlist and the deteriorating condition of his vision. *Id.* Staff did not respond to these requests. *Id.* Finally, on April 29, 2013, Capps examined McPartlin. *Id.* Although Capps found the exam "unremarkable," at McPartlin's insistence, Capps placed McPartlin back on the list. *Id.*

On May 9, 2013, three years after his initial request, McPartlin went to the optometrist. *Id.* The optometrist, Dr. Anthony Borgognoni, found a melanoma tumor on McPartlin's right optic nerve and referred McPartlin for radiation plaque therapy. *Id.* at 2–3. Borgognoni emphasized that in order to save McPartlin's right eye, treatment had to begin

within the next thirty-six hours. *Id.* at 3. On May 14, 2013, Capps placed a consultation for McPartlin to see an ophthalmologist, Dr. Dwain Fuller, but McPartlin was sent to two different providers, Joel Potasznik and Dr. Kamel Itani, neither of whom were able to perform the radiation plaque therapy. *Id.* McPartlin sent a request to staff to Hunter asking why he had not seen Fuller and stressing the seriousness of his condition. *Id.* Hunter did not respond to the request. *Id.*

Various doctors examined McPartlin five more times in the months that followed, each time noting the need for urgent treatment. *Id.* at 3–4. During this period, the melanoma on McPartlin's eye grew from 1 millimeter to over 7 millimeters in size and began to spread nasally. *Id.* Duckworth, Acting Clinical Director at FCI Seagoville, requested a CT scan. *Id.* at 3. Duckworth indicated that McPartlin was a "patient at severe risk" and "top priority," but she did not refer McPartlin to Fuller. *Id.* Although the Health Services Department approved McPartlin for the CT scan, he never received one. *Id.* Capps placed another referral for McPartlin to see Fuller on August 7, 2013. *Id.* at 4.

Finally, on October 4, 2013, nearly five months after Borgognoni's original recommendation, McPartlin was taken to Fuller. *Id.* At that point, radiation plaque therapy was no longer an option, and Fuller recommended immediate removal of McPartlin's right eye. *Id.* Fuller wrote a letter to Duckworth and Hunter informing them that McPartlin required enucleation of his right eye. *Id.* McPartlin spoke with Duckworth regarding his condition on October 21, 2013, but she was not aware of the visit with Fuller. *Id.*

Duckworth apparently reviewed Fuller's letter and acknowledged the need for enucleation a few days later. *Id.*

Over the next two months, McPartlin met with Itani and Borgognoni to discuss the surgery and his need for pre-operative and post-operative care. *Id.* at 4–6. Capps asked the scheduler to implement the treatment plan. *Id.* at 5. McPartlin sent two requests to staff to Hunter regarding his treatment. *Id.* Hunter did not respond to either request. *Id.* McPartlin also scheduled meetings with Duckworth to discuss the treatment plan, but she failed to appear twice. *Id.* At the third meeting, Duckworth assured McPartlin that appointments for his post-op care had already been scheduled. *Id.* at 6. Capps was also present at the meeting. *Id.*

### B. McPartlin Undergoes Surgery and Seeks Post-Operative Treatment

The enucleation surgery took place on December 30, 2013. *Id.* at 6. Itani placed a plastic conformer in McPartlin's eye to hold its shape and prescribed pain medication. Defs.' App. 167–76. Under his treatment plan, McPartlin was supposed to meet with Itani seven days after the surgery to have his stitches removed and for follow-up. Pl.'s App. 5. McPartlin was also supposed to see an ocularist, Donnie Franklin, four to five weeks after the surgery in order to be fitted for a prosthetic eye. *Id.*

McPartlin's post-operative treatment plan quickly fell through. Staff never provided McPartlin with the prescribed pain medication. *Id.* at 6. On January 7, 2014, after being taken to a doctor's office where he had no appointment, McPartlin removed his own stitches, which were coming apart. *Id.* McPartlin sent a request to staff to Hunter and a request to

staff to Hunter and Capps regarding his post-operative care. *Id.* at 7. Neither Hunter nor Capps responded. *Id.*

The follow-up visit with Itani took place on January 10, 2014, *see* Defs.' App. 179–82, but on January 14, 2014, the plastic conformer fell out of McPartlin's eye. Pl.'s App. 7. McPartlin informed Capps, who took no steps to treat him. *Id.* McPartlin sent two more requests to staff to Hunter, who did not respond. *Id.* at 7. On February 5, 2014, Borgognoni requested a consultation and lab tests for McPartlin and noted the need for a prosthetic eye fitting within the next thirty days. *Id.* Duckworth acknowledged receipt of Borgognoni's recommendation, but the diagnostic tests and prosthetic fitting did not materialize. *Id.*

Thirteen weeks after surgery, on March 29, 2014, McPartlin filed for institutional-level informal remedy using Form BP-8 ½, due to the lack of post-operative appointments, diagnostics, and prosthetic fitting. *Id.* at 8. No one responded to the BP-8 ½. *Id.* at 53. A few days later, Borgognoni noted that "orbital involution [was] possible if prosthesis not fitted timely," and that diagnostic tests were necessary to ensure that the melanoma had been completely removed and that the cancer had not metastasized. *Id.* at 7. Both Borgognoni and the Clinical Director at FCI Seagoville, William Resto, emphasized the need for a fitting within the next fourteen days. *Id.*

McPartlin filed an Administrative Remedy Request using Form BP-9 after staff informed him on April 16, 2014, that no appointments had been scheduled. *Id.* In his grievance, McPartlin complained about the lack of post-operative diagnostic tests, the failure

ORDER – PAGE 5

to schedule a prosthetic fitting, and staff's repeated denials of access to his own medical records. *Id.* On May 6, 2014, McPartlin met with Resto and Hunter regarding the BP-9. *Id.* They promised to address his complaints immediately, and McPartlin signed the BP-9, indicating that it was resolved. *Id.*

On May 27, 2014, McPartlin met with Donnie Franklin, an ocularist, for a prosthetic eye fitting. *Id.* Due to the missing conformer, however, scar tissue had formed in McPartlin's eye. *Id.* Franklin replaced the conformer and advised follow-up within the next four weeks. *Id.* McPartlin sent a request to staff to Hunter regarding the follow-up appointment with Franklin, but she did not respond. *Id.* McPartlin filed a second BP-9 grievance after staff informed him on June 11, 2014, that the follow-up appointments with Itani and Franklin had not been scheduled. *Id.* at 9. In the BP-9, McPartlin asked that staff fulfill his requests prior to his departure for a halfway house in Oregon, which was scheduled to take place on November 5, 2014. *Id.*

On June 25, 2014, nearly six months after the enucleation surgery, McPartlin underwent a PET scan, which yielded "questionable" results regarding the possibility of metastasis and recommended immediate follow up. *Id.* McPartlin sent three requests to Resto to obtain his PET scan results. *Id.* Resto ignored the requests. *Id.* McPartlin also sent a request to staff to Hunter. *Id.* Hunter did not respond. *Id.* McPartlin sent two other requests to staff to Associate Warden B. Von Blanckensee, who did not respond. *Id.* at 10. McPartlin sent another request to staff to Hunter on July 17, 2014, who responded "follow

up as needed." *Id.* On July 29, 2014, Resto reviewed the PET scan and ordered a CT scan, but he did not discuss the results with McPartlin. *Id.*

McPartlin met with Hunter on August 2, 2014, to discuss his second BP-9 grievance. *Id.* Hunter handed over some of McPartlin's medical records and informed him that an appointment for prosthetic fitting with Franklin had been scheduled. *Id.* Hunter also promised to schedule McPartlin for an ultrasound with Itani and for a consult with Resto regarding the results of the PET scan. *Id.* McPartlin again signed the BP-9, indicating that it was resolved, but none of the appointments was scheduled. *Id.* at 11. On August 18, 2014, McPartlin filed a Regional Administrative Remedy Appeal using Form BP-10. *Id.*

On August 26, 2014, McPartlin met with Franklin to obtain measurements for his prosthesis. *Id.* Franklin told McPartlin that he needed one more appointment to receive the prosthesis, and McPartlin sent a request to staff to Hunter, reminding her of the necessary appointment. *Id.* Hunter did not respond. *Id.* McPartlin also sent a request to staff to Resto regarding his various appointments. *Id.* Resto did not respond. *Id.* McPartlin contacted U.S. Senator Jeff Merkley, who wrote to the prison warden regarding McPartlin's treatment. *Id.* On September 12, 2014, the warden assured Senator Merkley that the PET scan follow-up, the follow-up with Itani, and the prosthesis appointment had all been scheduled or were in the process of being scheduled. *Id.*

On September 17, 2014, McPartlin met with Resto, who disclosed the results of the PET scan and referred him to an oncologist. *Id.* On September 26, 2014, Franklin fitted McPartlin with a prosthetic eye. Defs.' App. 230–33. McPartlin sent at least three more

ORDER – PAGE 7

requests to staff to Hunter regarding his need for a CT scan, the required follow-up with Itani, and the reference to an oncologist. Pl.'s App. 11–13. Hunter did not respond. *Id.*

The Regional Administrative Remedy Coordinator informed McPartlin on September 29, 2014, that his BP-10 appeal had been rejected. *Id.* at 12. The coordinator claimed that McPartlin withdrew the grievance at his own request. *Id.* McPartlin wrote to the coordinator, explaining that the grievance was not withdrawn and resubmitting a BP-10 appeal for consideration. *Id.* The coordinator rejected the second BP-10 appeal on October 8, again stating that the grievance had been withdrawn. *Id.* McPartlin filed a Central Office Administrative Remedy Appeal using Form BP-11 on October 20, 2014. *Id.* at 13.

At a medical open house on October 29, 2014, McPartlin reminded staff that he would soon be released to the halfway house in Oregon. *Id.* at 12. A staff member informed McPartlin that he had not been scheduled for any of his recommended treatments. *Id.* She asked if McPartlin would be willing to delay his departure for thirty to sixty days so that she could schedule his tests and appointments. *Id.* McPartlin's Unit Manager, however, rejected the proposed delay and threatened to "cancel the whole thing" if McPartlin insisted on receiving medical treatment. *Id.* McPartlin did not receive any of the recommended treatment prior to his release to the halfway house. *Id.*

### C. McPartlin Released to the Halfway House, Then Returned to Prison for Additional Medical Treatment

On November 3, 2014, McPartlin finished his prison sentence, and the Bureau of Prisons released him to the halfway house in Oregon. *Id.* Upon his arrival on November 5, 2014, however, a deputy sheriff handcuffed McPartlin and escorted him to the county jail.

ORDER – PAGE 8

*Id.* The next day, the Medical Director of the Bureau of Prisons and the Medical Director of the Western Region of the Bureau of Prisons advised McPartlin that, due to the substandard care he received at FCI Seagoville, he was being transferred to the Sheridan Detention Center for treatment at Oregon Health Science University. *Id.*

On December 9, 2014, McPartlin underwent a PET scan and a dedicated CT scan at the McMinnville Medical Center. Defs.' App. 256–57, 259. Dr. William Pierce did not find any recurrence of the melanoma, but recommended follow-up imaging at 6- to 12-month intervals for at least five years. *Id.* McPartlin did not receive the results of his scan. Pl.'s App. 14. On December 9, 2014, an oncologist informed McPartlin that he did not have cancer. *Id.* The oncologist did not examine McPartlin, whose lymph nodes were reactive and swollen. *Id.* McPartlin never went to Oregon Health Science University. *Id.*

On December 10, 2014, McPartlin wrote to his case manager, requesting his return to the halfway house. *Id.* The case manager informed McPartlin that he was scheduled for release to the halfway house on January 22, 2015, but McPartlin remained in prison. *Id.* On July 24, 2015, McPartlin was released from FCI Sheridan via good conduct time release. Defs.' App. 4.

McPartlin wrote twice to the Central Office regarding his BP-11 appeal. Pl.'s App. 14. On December 19, 2014, the Central Office rejected the BP-11, concurring with the opinion of the Regional Director. Defs.' App. 9. McPartlin filed two more BP-11s, each time reurging his appeal. *Id.* at 9–11. The Central Office rejected these appeals as well, and

ORDER – PAGE 9

directed McPartlin to restart the administrative grievance process by seeking an informal remedy at the institutional level. *Id.*

## II. THE SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986).   Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden.   *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).   Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'"   *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. THE COURT DENIES SUMMARY JUDGMENT ON EXHAUSTION OF REMEDIES

The Prison Litigation Reform Act (the "PLRA") requires a prisoner to exhaust all available administrative remedies before he may bring a *Bivens* action in federal court.   42 U.S.C. § 1997e.   Failure to exhaust administrative remedies is an affirmative defense that a federal defendant must plead and prove.   *Jones v. Bock*, 549 U.S. 199, 216 (2007).   Whether a prisoner has exhausted administrative remedies, and whether administrative remedies are "available" under the PLRA, are mixed questions of law and fact.   *Dillon v. Rogers*, 596 F.3d 260, 266 (2010).   However, because "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury."   *Id.* at 272.

Generally, a federal prisoner must follow four steps to exhaust his administrative remedies.   First, the Code of Federal Regulations requires the prisoner to seek an informal resolution of his complaint.   28 C.F.R. § 542.13.   A prisoner then has twenty days after the

date of the event giving rise to the complaint to file a formal Administrative Remedy Request using Form BP-9.  28 C.F.R. § 542.14.  If a prisoner "is not satisfied with the Warden's response" to his request, he may file a Regional Administrative Remedy Appeal using Form BP-10 within twenty days of the date on the response.  28 C.F.R. § 542.15.  If the prisoner "is not satisfied with the Regional Director's response" to his appeal, he may then submit a Central Office Administrative Remedy Appeal using Form BP-11 within thirty days of the response from the Regional Director.  *Id.*

The Official Defendants do not challenge the timeliness of McPartlin's requests and appeals.  Rather, the Official Defendants contend that McPartlin voluntarily withdrew his two BP-9s by reaching informal resolutions with Hunter.  Consequently, and as the Regional Director repeatedly informed McPartlin, he needed to start the process over by seeking informal resolution of his complaint and filing a third BP-9.  The Official Defendants maintain that, by skipping these steps and appealing directly to the Regional Director and General Counsel, McPartlin failed to exhaust all his administrative remedies.

Several district courts have held that, when a prisoner withdraws a grievance from the administrative process prior to a formal decision on the merits of the grievance, the PLRA exhaustion requirement ordinarily bars the prisoner from seeking judicial relief.  *See, e.g.*, *Beard v. Bureau of Prisons*, 2013 WL 5951160, at *5 (N.D. Tex. 2013); *McDowall v. Metro. Corr. Ctr.*, 2010 WL 649744, at *5 (S.D.N.Y. 2010).  To the Court's knowledge, however, this rule has never been applied where the prisoner subsequently filed a second BP-9, two BP-10s, and three BP-11s, all regarding the same concerns.  In addition, the Court is unable

to determine based on the evidence presented whether McPartlin's agreement to an informal resolution of his grievance constituted a voluntary withdrawal under prison regulations. *Compare Beard*, 2013 WL 5951160, at *5 (finding informal resolution effected voluntary withdrawal), *with Foster v. Coody*, 2008 WL 544676, at *4 (M.D. La. 2008) (finding prisoner voluntarily withdrew grievance "by signing a form, witnessed by two (2) security officers, expressing his wish to withdraw the grievance").   In fact, neither agreement regarding the two BP-9s ever mentioned that McPartlin was withdrawing his grievance. *See* Pl.'s App. 32, 34.

The Court's inability to resolve this factual issue stems in part from the opacity of the Administrative Remedy Program itself.   The regulations governing this program do not contemplate informal resolution of a BP-9, let alone explain that such an agreement will effect a voluntary withdrawal of the BP-9.   If anything, informal resolution is supposed to take place within the context of a BP-8 or BP-8 ½.   *See* 28 C.F.R. § 542.13 ("[S]taff shall attempt to informally resolve the issue *before* an inmate submits a Request for Administrative Remedy." (emphasis added)).   And nothing in the Code of Federal Regulations bars a prisoner from filing an appeal after agreeing to an informal resolution of a BP-9 grievance. Section 542.15 merely authorizes a prisoner to file a BP-10 or BP-11 if he "is not satisfied" with the Warden or Regional Director's response.   28 C.F.R. § 542.15.

The Supreme Court has recently explained that "when a remedy is . . . essentially 'unknowable' – so that no ordinary prisoner can make sense of what it demands – then it is also unavailable." *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016).   Here, the regulations

governing the Administrative Remedy Program provide no guidance regarding the particular procedural posture that McPartlin faced. The Official Defendants argue that the Regional Director's responses placed McPartlin on sufficient notice of the appropriate course of action, and that McPartlin blatantly ignored this advice. However, even the Regional Director's responses fail to explain that informal resolution of a BP-9 will result in voluntary withdrawal of the grievance – a substantial source of confusion for McPartlin. *See, e.g.*, Pl.'s App. 53 ("For the record, neither of these institutional Administrative Remedies (BP-9)'s, were withdrawn by me."). The Court is unable to determine whether an ordinary prisoner with access to the same materials as McPartlin would have known to file a BP-9, reject any informal resolution, and obtain a formal response from the Warden prior to filing a BP-10 or BP-11.

Accordingly, the Court finds that, even if the technically appropriate course of action was for McPartlin to file a third BP-9, material issues of fact remain as to whether this remedy was actually "available." The Court denies summary judgment on the Official Defendants' exhaustion of administrative remedies defense.

### IV. THE COURT DENIES SUMMARY JUDGMENT ON MCPARTLIN'S *BIVENS* CLAIMS

McPartlin brings claims under *Bivens* for violation of his Eighth Amendment rights.[3] The Official Defendants assert that they are entitled to summary judgment on these claims

---

[3]McPartlin briefly mentions in his Original Complaint that the Official Defendants violated his Fourteenth Amendment rights as well. *See* Pl.'s Compl. ¶93 [1]. However, the parties did not address this claim in their briefing on the pending motion. Accordingly, the Court does not consider the sufficiency of the Fourteenth Amendment claim here.

because McPartlin has not submitted proof of deliberate indifference. Duckworth and Hunter also move for summary judgment on the basis of qualified immunity. Because genuine issues of material fact remain as to these issues, the Court denies the Official Defendants' motion for summary judgment on McPartlin's *Bivens* claims.

### A. Issues of Fact Remain as to the Official Defendants' Deliberate Indifference

McPartlin asserts that the Official Defendants violated his Eighth Amendment rights by acting with conscious and deliberate indifference to his serious medical needs. The Eighth Amendment requires prison officials to "ensure that inmates receive adequate . . . medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates this duty "when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs . . . ." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). "The mere delay of medical care can also constitute an Eighth Amendment violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Id.* (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

A prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "The 'deliberate indifference' standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversights." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (internal quotation marks and citations omitted). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute

deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). On the other hand, prison officials act with deliberate indifference when they "refuse[] to treat [a prisoner], ignore[] his complaints, intentionally treat[] him incorrectly, or engage[] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter*, 467 F.3d at 464 (internal quotation marks and citation omitted).

The Official Defendants do not contend that they lacked subjective awareness of a serious risk of harm to McPartlin's health. Instead, the Official Defendants argue that they adequately addressed that risk. Capps and Duckworth maintain that they evaluated and treated McPartlin's condition several times, and that they placed timely referrals to outside specialists as needed. And Hunter asserts that none of her delayed responses to McPartlin's requests for treatment were intentional or designed to cause him pain.

Nevertheless, McPartlin has provided sufficient evidence to establish a genuine issue of material fact as to the Official Defendants' deliberate indifference. McPartlin's medical records and grievances show that Capps, Duckworth, and Hunter were all aware of Borgognoni's instruction on May 9, 2013, that McPartlin visit Fuller within 36 hours to avoid the loss of vision in his right eye and prevent the cancer from spreading. Although Capps placed two consultations for McPartlin to see Fuller – one on May 14, 2013, and another on August 7, 2013 – he did not act within the 36 hour time period advised by Borgognoni. Capps also ignored four other recommendations from Borgognoni detailing troubling changes in the melanoma and reurging the need for a consultation with Fuller. Duckworth

admittedly requested a CT scan of McPartlin's right eye on July 18, 2013, but Duckworth took no other steps to save McPartlin's vision or prevent the cancer from spreading. Instead, Duckworth referred McPartlin to Itani, who does not perform radiation plaque therapy. Hunter made absolutely no effort to follow Borgognoni's instructions, avoid removal of McPartlin's right eye, or treat the cancer in its early stages. As a result, McPartlin's melanoma grew from 1 millimeter to more than 7 millimeters in size, and McPartlin lost his eye.

McPartlin's records and grievances also show that Capps, Duckworth, and Hunter were all aware of Itani's instructions regarding McPartlin's post-operative care. Capps, Duckworth, and Hunter were also aware that McPartlin had been diagnosed with choroidal melanoma, and an obvious risk stemming from such diagnosis was the possibility of metastasis. Nevertheless, none of the Official Defendants took any steps to ensure that McPartlin would visit with Itani seven days after the surgery for removal of stitches and follow-up, or that McPartlin would undergo a CT scan and ultrasound to ensure eradication of the melanoma.[4] Duckworth and Hunter, in particular, not only ignored these instructions, but even told McPartlin that some of the appointments were already planned, scheduled, or

---

[4]McPartlin contends that the Official Defendants ignored other aspects of his post-operative treatment plan, including the provision of pain medication and the need to visit Franklin four to five weeks after surgery for a prosthetic eye fitting. McPartlin also notes that Capps refused to provide any treatment to McPartlin after his plastic conformer fell out, further complicating his prosthesis fitting. However, McPartlin has not provided any evidence establishing that the complications attending his prosthesis fitting posed a substantial risk of serious harm to his health. The Court does not find these actions sufficient to establish an Eighth Amendment violation.

ORDER – PAGE 17

in the process of being scheduled when they were not. Resto further informed Duckworth and Hunter that McPartlin's PET scan results were "questionable," and that he required a reference to an oncologist. But when McPartlin was transferred to the halfway house, he still had not received any confirmation that the enucleation surgery performed ten months prior had successfully eradicated his cancer, and he had not seen an oncologist.

Borgognoni repeatedly warned the Official Defendants that, unless McPartlin received the recommended treatment in a timely manner, he would lose his right eye. Borgognoni, Itani, and Resto also repeatedly warned the Official Defendants that, unless McPartlin received appropriate follow-up care, his cancer may spread undetected to other parts of his body. A reasonable jury might conclude that the Official Defendants ignored Borgognoni, Itani, and Resto's repeated warnings and acted with wanton disregard to McPartlin's serious medical needs. Accordingly, the Court denies summary judgment on the *Bivens* claims against the Official Defendants.

### B. Issues of Fact Remain as to Duckworth and Hunter's Qualified Immunity

"Qualified immunity is a defense available to public officials performing discretionary functions ' . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Noyola v. Tex. Dep't of Human Res.*, 846 F.2d 1021, 1024 (5th Cir. 1988) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine balances two interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because "qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law,'" denial of qualified immunity is appropriate only in rare circumstances. *Brady v. Ford Bend Cty.*, 58 F.3d 173, 173–74 (5th Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To resolve a public official's qualified immunity claim, a court must consider two factors. First, has the plaintiff shown a violation of a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). And, second, was the right "clearly established" at the time of the public official's alleged misconduct? *Id.* The second inquiry is critical: unless the official violated a clearly established constitutional right, qualified immunity applies. *Pearson*, 555 U.S. at 231. "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 235.

Viewing the evidence in the light most favorable to McPartlin, a reasonably jury could conclude that Duckworth and Hunter acted with deliberate indifference to McPartlin's serious medical needs. A prisoner's right to adequate medical care under the Eighth Amendment has long been clearly established. *See Estelle*, 429 U.S. at 103–04; *Easter*, 467 F.3d at 465. The Court holds that Duckworth and Hunter are not entitled to summary judgment on the issue of qualified immunity.

## CONCLUSION

Because genuine issues of material fact remain, the Court denies the motion for summary judgment.

Signed July 28, 2016.

David C. Godbey
United States District Judge